NOT DESIGNATED FOR PUBLICATION

No. 126,112

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE ISAAC BREWER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Oral argument held March 5, 2024. Opinion filed April 26, 2024. Affirmed.

*David L. Miller*, of The Law Office of David L. Miller, of Wichita, for appellant.

*Kristi D. Allen*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM: Jose Isaac Brewer appeals the district court's denial of his postsentencing motion to withdraw his guilty plea to aggravated battery. Having reviewed the record, we affirm.

*Factual and Procedural Background*

On September 9, 2017, Brewer was at Champs Bar and Grill in Wichita. While there, he struck Gregory Jordan, leaving Jordan hospitalized in critical condition for

1

"some time." As a result, the State charged Brewer with reckless aggravated battery, a severity level 5 person felony.

After Brewer's preliminary hearing, the district court bound him over on a severity level 4 aggravated battery charge, which carried the elevated culpable mental state of "knowingly" rather than the originally charged mental state of "recklessly." The State amended its complaint accordingly.

In July 2018, the district court appointed a new attorney to represent Brewer—Stephen House. In January 2019, House moved for immunity from prosecution under K.S.A. 21-5231(a), claiming that Brewer's use of force against Jordan was justified because Brewer believed such force was necessary to defend himself.

But rather than proceed with the immunity motion, in April 2019, Brewer entered a plea agreement. Brewer pleaded guilty to the originally charged severity level 5 aggravated battery, a decreased severity level from the amended charge. And although Brewer's presumptive sentence was prison, under Brewer's plea agreement both parties agreed to recommend the low number in the sentencing grid box, and to ask the court to grant Brewer's request for a downward dispositional departure from imprisonment to probation.

*Sentencing, Probation, and Probation Revocation*

At his sentencing in May 2019, the district court granted the dispositional departure the parties had agreed to in the plea agreement and sentenced him to prison for 114 months. It then suspended Brewer's prison sentence and placed him on probation for 36 months.

But soon after the district court placed Brewer on probation, the State filed a warrant alleging that Brewer had violated the terms of his probation by

- failing to attend his new client orientation;
- driving without a valid driver's license; and
- committing new crimes—"Driving Under the Influence with Law Enforcement Officer/Obstruct," driving while suspended, criminal damage to property, and other driving offenses.

A different attorney represented Brewer for these probation violations, which Brewer did not contest. Thus, in September 2019, the district court found that Brewer had violated his probation by failing to attend his probation orientation meeting and by committing new crimes and ordered him to serve his original 114-month prison sentence.

*Brewer's Motion to Withdraw Plea*

Eight months later, in May 2020, Brewer moved pro se to withdraw his plea under K.S.A. 22-3210. In this motion, Brewer first argued the district court should permit him to withdraw his plea because he was actually innocent—he had acted in self-defense during the altercation. He argued the victim was the initial aggressor and that his self-defense training kicked in when the victim, who was much larger than Brewer, flinched in Brewer's direction. Second, Brewer argued that his attorney had provided ineffective assistance of counsel by not properly investigating Brewer's innocence. House failed to: (1) investigate text messages containing threats against Brewer that Brewer thought could have been linked to Jordan; and (2) get copies of videos that House could have played at the hearing on his immunity motion. Third, Brewer asserted his plea was not knowingly made because he had not received reasonable, competent advice. And House had not provided him sufficient advice about the plea offer because: (1) House failed to gather all the facts and analyze them before advising Brewer to plead guilty; and (2) House did

3

not advise Brewer if he should accept the plea offer. Finally, Brewer argued that he did not have enough time to decide whether to plead guilty because the plea offer was only valid for two days—until the immunity hearing began.

Brewer added that he was prejudiced by House's allegedly deficient performance because House did not investigate the facts of the case and thus could not adequately advise Brewer so that he could make an informed decision about whether to accept the plea offer. Brewer claimed that if a proper investigation had been done, House would have collected the facts necessary to present an immunity defense, and even if immunity from prosecution were denied, sufficient evidence would have supported his self-defense theory at trial for a jury to find reasonable doubt and acquit Brewer.

The State responded, raising multiple arguments to refute Brewer's claims.

*Evidentiary Hearing on the Motion to Withdraw Plea*

The district court held an evidentiary hearing on Brewer's motion to withdraw his plea, lasting four days. Five individuals testified at those hearings, including House and Brewer. Because their testimonies contradict each other, we set it out at length.

*House's Testimony*

House testified at length. He had been an attorney since 1984 and specialized in criminal and private defense. He was appointed to represent Brewer in his aggravated battery case about 10 months after the case was filed. He requested and reviewed all the case's discovery, including police reports, body cam videos, surveillance video from the bar where the incident occurred, transcripts of police interviews, and the transcript from the preliminary hearing in the case. He discussed with Brewer the evidence provided in discovery, both positive and negative, and showed him the written discovery.

House was aware of the threatening text messages and he and Brewer discussed whether they would be relevant. Brewer did not tell House who had sent the messages, and because the messages did not relate specifically to Jordan, House asked Brewer to determine who had sent them and how they related to Jordan. According to House, Brewer never gave him the text messages or their associated phone numbers.

House then testified about the defense strategy. The theory of their case was self-defense. To accomplish this defense, House moved for immunity from prosecution after reviewing all the police reports, watching the videos of the incident "over and over," reviewing the transcript of the preliminary hearing, and speaking with Brewer. House discussed the Kansas statutes and caselaw about immunity with Brewer and explained that at the hearing on the motion, the State would have the burden to prove Brewer was not acting in self-defense.

House recognized that some evidence was potentially helpful to Brewer's claim of immunity, such as statements from the bartender and server the night of the altercation—both said Jordan was the person who was loud and angry. And Jordan's own testimony during the preliminary hearing was that he had started and participated in fights when he was younger. But other evidence was neutral for Brewer's immunity claim, and other evidence was not helpful, including the videos of Brewer and Jordan moving through the bar before Brewer punched Jordan. House discussed with Brewer the evidence for the immunity hearing, both helpful and unhelpful.

The State had asked the court to decide Brewer's immunity motion without a hearing, based solely on the preliminary hearing transcript. But House objected to this request because he had not been Brewer's attorney at the time of the preliminary hearing and wanted the opportunity to cross-examine witnesses. House planned to play some of the bar's surveillance video and to have Brewer testify at the immunity hearing. He knew the State had subpoenaed the bartender, server, and bouncer who were working that

5

night, and an off-duty employee of the bar who was also present, and he planned to cross-examine them.

House told Brewer he did not know what the outcome of the immunity hearing would be, and explained the decision on whether he would get immunity would be decided by the district court judge. House informed Brewer that even if the judge denied immunity, they could still get a jury trial and argue the self-defense claim there. He explained to Brewer the requirement of a successful self-defense claim and that Brewer had no duty to retreat. House was prepared to go forward with the immunity hearing and, if that motion were denied, he would have represented Brewer at a jury trial.

House then testified to the plea offer and the circumstances of it. House called the prosecutor while Brewer was in his office to request a plea offer. Brewer had asked for a plea offer but House did not remember when, other than it was before the immunity hearing. The State's first offer was for Brewer to plead guilty as charged and the State would agree to recommend a departure to probation. The second offer was for Brewer to plead to a severity level 5 offense and the State would agree to recommend probation. House discussed the second offer with Brewer two days before the scheduled immunity hearing and read him the offer over the phone. That plea offer was valid until the hearing on Brewer's immunity motion. House and Brewer discussed the risk of accepting the plea agreement as well as the risk of going forward with the immunity hearing. Brewer did not want to accept the plea offer immediately and said that he wanted to speak with his family before deciding.

When the morning of the immunity hearing arrived, Brewer had not yet accepted the plea offer, and did not decide to do so until he and his parents were sitting in the courtroom. Brewer's father advised him not to accept the plea and to continue with the immunity hearing, but Brewer stated he wanted to accept the offer. Brewer did not ask House for a recommendation whether he should accept the offer, and House said it was

Brewer's sole decision if he wanted to take the plea or to go forward with the immunity hearing. House testified he did not threaten or coerce Brewer into accepting the plea and did not suggest he would withdraw from the case if Brewer did not accept the plea.

Throughout House's representation of Brewer, he discussed Brewer's rights with him and prepared the acknowledgment of rights form with him once he decided to accept the plea offer. On the day of the plea, House provided Brewer with a copy of the acknowledgment of rights form for Brewer to read. They discussed it and if Brewer had any questions House answered them. Brewer expressed no concerns about having accepted or entered the plea before his sentencing hearing. The first time House learned that Brewer was unhappy with his plea and wanted to withdraw it was after Brewer's probation was revoked.

*Brewer's Testimony*

Next, Brewer testified. He informed the district court that he had showed House threatening text messages, which had accused him of doing nothing but smoking, drinking, and neglecting his family. Jordan had accused him of the same during their altercation, so Brewer reasoned that the text messages must be linked to Jordan and were thus relevant. Brewer told House that he could get transcribed copies of the texts from his previous attorney at the public defender's office. Yet House never got copies of the texts and did not discuss the messages with him before Brewer had to decide about the plea offer. Brewer testified that the night of the altercation he did not think Jordan was linked to the individuals who sent him the threatening text messages. But in retrospect, he believed there was a connection.

Brewer testified House did not give him discovery and did not discuss any of the evidence with him. House did not discuss the transcript of the preliminary hearing with

7

him, nor did he explain the law about immunity and self-defense. Nor did House explain what would happen at the immunity hearing or prepare him for his testimony there.

Brewer claimed he did not learn of the plea offer until the night before the immunity hearing, when he was told the offer would not be available after the immunity hearing. Brewer was fine with that limitation. Brewer stated he accepted the plea offer because the State bullied him and hindered his defense by changing his lawyer and judge after the preliminary hearing. And House had threatened and coerced him into taking the plea offer by telling him that he would get 15 to 20 years in prison if he refused to take it.

Brewer acknowledged that his father had told him not to accept the plea offer, but he was overwhelmed and scared once House had told him his likely prison sentence if he were found guilty. Brewer also acknowledged that his pro se motion to withdraw his plea alleged that House did not advise him whether to accept the plea. Even so, Brewer testified that House had told him to take the plea, and House then refused to answer any further questions Brewer asked him.

Brewer testified he did not see a copy of the plea agreement or the acknowledgment of rights form until the day of the plea hearing. True, his signature was on the bottom of the form, but he had not read the forms before signing them. House did not read or review the forms or plea with him but just told Brewer to sign the documents in the courtroom.

Still, Brewer agreed that:

- He was present in court when entering his plea;
- he had signed the acknowledgment of rights and plea agreement forms;
- at the plea hearing he told the district court that House had explained the forms and that he understood the documents and the terms of his plea;

8

- he told the district court that he was satisfied with House's service;

- he did not tell the court that he did not want to enter the plea;

- it was his choice to enter the plea, but he chose to do so only because he did not want to make the State or the district court judge angry;

- he told the district court he was happy with House's services, but only because House had told him to say "yes" to all the judge's questions during the plea hearing.

Finally, Brewer testified that he acted only in self-defense as Jordan "rushed up on [him]" and flinched toward him right before Brewer punched him. Brewer testified that if he had all the information, he would have rejected the plea offer because too much evidence showed Jordan was the aggressor. Brewer maintained that because he had no duty to retreat, he was innocent.

*The District Court's Decision*

In December 2022, the district court denied Brewer's motion to withdraw his plea. It found that a "fair assessment of Mr. House's representation, undistorted by the passage of time and the fragmentary criticisms levied by [the] defense," led it to conclude that House had provided good and effective representation to Brewer that led to a good result. Brewer had suffered no prejudice because of any of the alleged deficiencies in House's representation, and Brewer had failed to show he was misled, coerced, mistreated, or unfairly taken advantage of in choosing to withdraw his immunity motion and enter his guilty plea. The district court thus found his plea was fairly and understandably made. Brewer now appeals.

9

*Did the District Court Abuse Its Discretion in Denying Brewer's Postsentencing Motion to Withdraw His Guilty Plea?*

Brewer argues the district court abused its discretion in denying his postsentencing motion to withdraw his guilty plea to aggravated battery. He argues that he did not receive competent representation, that his plea was not fully advised, and that he would not have pleaded guilty if properly represented. He also alleges that manifest injustice warrants the withdrawal of his plea because he was misled, coerced, mistreated, or unfairly taken advantage of. Finally, he argues that manifest injustice permits him to withdraw his plea because he is actually innocent. The State denies each of these claims.

*Standard of Review*

Generally, appellate courts review a trial court's decision to deny a postsentence motion to withdraw a guilty plea for an abuse of discretion. *State v. Cott*, 311 Kan. 498, 499, 464 P.3d 323 (2020). A judicial action constitutes an abuse of discretion only if:(1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The movant, here Brewer, bears the burden to prove the district court erred in denying the motion. *State v. Fox*, 310 Kan. 939, 943, 453 P.3d 329 (2019).

K.S.A. 22-3210 "distinguishes between withdrawing a plea before sentence, which requires 'good cause,' and withdrawing a plea after sentence, which may be done only to correct 'manifest injustice.'" *Cott*, 311 Kan. at 500; see K.S.A. 22-3210(d)(1), (2). The Kansas Supreme Court has defined manifest injustice in this context to mean something "'obviously unfair'" or "'shocking to the conscience.'" *White v. State*, 308 Kan. 491, 496, 421 P.3d 718 (2018).

When considering whether a defendant has shown the manifest injustice necessary to withdraw a plea after sentencing, a court generally considers three factors: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made. *State v. Hutto*, 313 Kan. 741, 745, 490 P.3d 43 (2021); *State v. Frazier*, 311 Kan. 378, 381, 461 P.3d 43 (2020). These "*Edgar* factors" should not "be applied mechanically and to the exclusion of other factors." *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014); see *State v. Schow*, 287 Kan. 529, 542-43, 197 P.3d 825 (2008) (referring to these three factors as "*Edgar* factors"). Brewer asserts all three factors apply to him. He also asserts actual innocence, which is another factor a court may sometimes consider when determining whether manifest injustice permits the withdrawal of a plea. See *State v. Garcia*, 295 Kan. 53, 63, 283 P.3d 165 (2012).

1.      *Brewer Was Represented by Competent Counsel*

In determining whether Brewer had competent counsel, we use the constitutional test for ineffective counsel.

> """When a postsentence motion to withdraw a plea alleges ineffective assistance of counsel, the constitutional test for ineffective assistance must be met to establish manifest injustice." That test asks: "(1) whether the attorney's performance fell below an objective standard of reasonableness and (2) whether there is a reasonable probability that, but for the attorney's errors, the result of the proceeding would have been different." There is a "strong presumption" that counsel provided "'adequate assistance'" and "'made all significant decisions in the exercise of reasonable professional judgment.'" Prejudice means "a reasonable probability that, but for the deficient performance, the defendant would have insisted on going to trial instead of entering the plea." A reasonable probability is a "'probability sufficient to undermine confidence in the outcome.'" [Citations omitted.]'" *State v. Shields*, 315 Kan. 131, 141, 504 P.3d 1061 (2022) (quoting *State v. Johnson*, 307 Kan. 436, 447, 410 P.3d 913 [2018]).

11

So to sustain his claim that manifest injustice permits the withdrawal of his plea because of his counsel's ineffectiveness, Brewer must show, first, that House's performance fell below an objective standard of reasonableness and, second, that he was prejudiced by this ineffective assistance. See 315 Kan. at 141.

*Reasonableness of Counsel's Performance*

"'A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Bricker*, 292 Kan. 239, 252, 252 P.3d 118 (2011).

Brewer's argument that House's representation was ineffective centers on three main complaints: the video evidence, how long House spent in person with Brewer explaining the evidence and law about self-defense, and the threatening text messages.

First, as to the video evidence, Brewer argues that House's "ambivalence" towards the bar surveillance video and House's failure to investigate enhancement of the video was "objectively unreasonable." Jerry Hawkins, a Wichita attorney, had enhanced the video by reviewing the surveillance video from the bar, zooming in on parts of it, and splicing sections together. Brewer argues that the video shows Jordan flinching toward Brewer and that House should have treated this evidence more seriously.

But Brewer presented the enhanced video to the district court. Our review of the video shows it is not as clear as Brewer alleges. The two men are having a discussion and there is some body movement before Brewer punches Jordan, but that movement is minimal and is from both men. In fact, what Brewer describes as Jordan's "flinch" might reasonably be viewed as shifting one's body weight from one foot to another.

12

The testimony at the evidentiary hearing that the district court found credible was that House was prepared to argue at the immunity hearing that Jordan flinched at Brewer, causing Brewer to defend himself by punching the victim, and to play the bar surveillance video (without the need for video enhancement). House discussed with Brewer the evidence against him, how persuasive the video and witness testimony would be to the court, and how beneficial it would be to Brewer's request for immunity and claim of self-defense. House confirmed some evidence was helpful and other evidence was detrimental. And although Brewer testified that House never showed him the surveillance video, House testified to the contrary and the district court found House's testimony more credible. Brewer complains on appeal that House did not treat the video evidence seriously enough when preparing for Brewer's defense, but the district court made a factual finding otherwise and found that House intended to use the video at the immunity hearing and, if necessary, at trial. Essentially, Brewer asks us to perform a task we cannot do as an appellate court—reweigh the evidence and step in the place of the district court as the fact-finder. See *State v. Anderson*, 291 Kan. 849, 855, 249 P.3d 425 (2011). The evidence supports the district court's factual conclusions about House in relation to the surveillance video.

Second, Brewer complains House's representation was inadequate because he did not properly investigate the threatening text messages Brewer received from persons other than Jordan before the altercation. Brewer complains that House's failure to investigate the text messages prevented him from exercising his right to fully present his defense.

*Beyer's Testimony*

Brewer relies on the testimony of Zachary Beyer, a licensed private investigator employed by Brewer's appointed counsel for his motion to withdraw his plea. Before his altercation with Jordan, Brewer had received some threatening text messages, and

13

Brewer's motion counsel had asked Beyer to find out whether the phone numbers that had sent the texts were from known associates of Jordan. But Beyer could not link the senders of the threatening texts to any individuals associated with the case. Four years ago, however, when the incident occurred, Beyer might have been able to do so. Beyer also ran a background check on the victim and found that Jordan had been convicted of a drug offense in 1992, disorderly conduct in 2002, criminal deprivation of a motor vehicle in 2004, disorderly conduct/fighting in 2004, criminal trespass and assault in 2010, and a traffic offense in 2013.

When Brewer accepted the plea he knew of the text messages, and House testified that he had asked Brewer to "provide me something to go investigate." House testified that he could not figure out whether the texts were linked to the case without some knowledge of whom the texts were from. So House asked Brewer to give him an indication of whom they were from (even if by just providing him with phone numbers) because Brewer had them saved as contacts in his phone. Still, Brewer never informed House who had sent the texts, which numbers they were sent from, or how they might be connected to the altercation. Given those facts, and Beyer's inability to link the senders of the threatening texts to any individuals associated with the case, House's investigation was sufficient.

But even if House's investigation were less than complete, Brewer fails to show that House's judgments were unreasonable. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

14

House took his investigation as far as he could with the information Brewer gave him about the texts. He looked at the texts and asked Brewer for a list of numbers or people who had sent the texts because Brewer had that information stored in his phone. Yet House never received that information. And not until eight months later, after Brewer moved to withdraw his plea, did Brewer question House's professional judgment as to the texts. Sufficient evidence supports the district court's finding that House's investigation into the texts was adequate.

Third, Brewer argues that he spent under one hour in person with House over the two days right before the immunity hearing. He asserts that this was not enough time for House to go over all the discovery, discuss the law of self-defense and immunity, prepare Brewer's testimony for the immunity hearing, and discuss the other evidence and witnesses that would be introduced at the hearing. Brewer arrives at this amount of time by looking at House's appointed counsel claim form that House submitted at the end of his representation to account for his work. It shows that House had three in-person meetings with Brewer: .8 tenths of an hour, .6 tenths of an hour, and .4 tenths of an hour which included a call to the district attorney. Beyond those in-person meetings, before the plea hearing, House recorded taking one phone call from Brewer, at .1 tenth of an hour, and one call that was included with reading the plea agreement and calling the district attorney for a total of .2 tenths of an hour. Beyond these encounters, House testified that he and Brewer discussed the case when they met for court appearances, which occurred at least twice before the plea hearing.

Yet logic dictates that just because an attorney and client are not meeting in person it does not mean they are not communicating with each other. And here, there were phone calls between House and Brewer. Thus Brewer's focus solely on the in-person meetings and solely on the two days before the immunity hearing is too narrow.

Brewer cites *Aldrich v. State*, No. 109,326, 2014 WL 1707579, at *6-7 (Kan. App. 2014) (unpublished opinion), in support. There, another panel of this court held that defense counsel's representation of a client charged with first-degree murder was insufficient because the attorney had spent only three hours in person with the client before trial. The *Aldrich* panel found sufficient evidence supporting the district court's conclusion that the time the attorney invested in the case was not commensurate with the seriousness of the charges against the defendant. 2014 WL 1707579, at *7. But that panel also noted that "inadequate time spent preparing for trial must be combined with actual errors that prejudiced the defense to constitute ineffective assistance of counsel." 2014 WL 1707579, at *7 (citing *State v. Cheatham*, 296 Kan. 417, 433-34, 292 P.3d 318 [2013]). Because the district court in the case had "attributed the trial errors that occurred to the lack of time that [trial counsel] spent investigating the case," the panel affirmed the district court's finding that counsel provided ineffective assistance. 2014 WL 1707579, at *7, 16.

Brewer claims that House erred by not fully explaining and preparing Brewer for his self-defense theory. Brewer argues that House did not take the time to explain the law and evidence to him, including beneficial evidence such as transcripts of interviews describing Jordan's angry behavior before the altercation.

No bright line rule dictates how much time counsel needs to spend in person with a client when preparing a case. The time spent needs to fit the seriousness of the crime. See 2014 WL 1707579, at *7. House spent 39.20 hours preparing Brewer's case. His time log shows that he spent time reviewing all the discovery, doing legal research, preparing motions and legal filings, and discussing the case with the State and Brewer in person, over the phone, and via letter. Brewer argues that it is "simply not credible or frankly believable" that House did everything necessary to prepare Brewer for the immunity hearing and reviewed all the discovery with him in under an hour. But House testified that he had made copies of all the written reports and gave those to Brewer, that he had

16

also given him the videos to watch, and the district court credited that testimony. Because Brewer could have reviewed the potential evidence independently, a complete review of that evidence during House's meetings with him was unnecessary.

Resolution of this issue comes down to a credibility determination. House testified that he discussed the law on self-defense with Brewer and reviewed the discovery and evidence to be used at the immunity hearing and possibly trial during their in-person meetings and their phone calls. And Brewer signed the plea acknowledgment that stated he understood he was forfeiting his right to present a defense, and self-defense falls into that category. True, Brewer testified that House never discussed the discovery with him and did not discuss the law surrounding self-defense, but the district court did not find Brewer's testimony credible. But "[a]ppellate courts do not reweigh the evidence or assess witness credibility. Instead, appellate courts give deference to the trial court's findings of fact. *State v. Appleby*, 289 Kan. 1017, 1038, 221 P.3d 525 (2009)." *Anderson*, 291 Kan. at 855. Asking us to credit Brewer's testimony about this matter asks us to reweigh the evidence, which we cannot do.

2.      *Brewer Was Not Coerced*

Brewer also asserts that he was misled, coerced, mistreated, or unfairly taken advantage of. Brewer relies on his testimony that he did not learn of the plea offer until the night before the immunity hearing, that he did not see a copy of the plea agreement or the acknowledgment of rights form until the day of the plea hearing, and that he had not read the forms before signing them. He also contends that the State bullied him by changing his lawyer and judge after the preliminary hearing, and that House had threatened and coerced him into taking the plea offer by telling him that he would get 15 to 20 years in prison if he refused to take it. Brewer was overwhelmed and scared once House told him this potential sentence, and House failed to advise him whether to accept the plea.

17

Brewer also relies on testimony by Denzale De Berry to confirm that Brewer did not want to take the plea offer. Brewer was an independent contractor who worked for De Berry's property management company. He testified that in April 2019, he and Brewer were together when Brewer received a phone call. De Berry heard Brewer giving "a negative response" to the other person. After Brewer got off the phone, Brewer told De Berry that the call was from his attorney who had told him that he needed to take the plea offer. Brewer told De Berry that he did not want to plead, and he planned to call his parents to talk with them about his options.

Although we do not accept Brewer's characterization of these events, we find no sharp contradiction between his recitation of these events and House's testimony about them. Still, Brewer's testimony about this is internally inconsistent, as he both agreed and denied that he had read the plea agreement and the acknowledgment of rights forms before signing them, and both asserted and denied that House had advised him to take the plea.

The matters that Brewer alleges are coercion are no more than the stressors attendant to the ordinary course of criminal litigation. We find nothing unusual or coercive in the swiftness of the State's deadline for its plea offer, the change of a judge or an attorney during pretrial proceedings, an attorney's informing his client what his possible sentence could be, or a defendant's changing his mind about taking a plea offer. Brewer fails to show that the government misled, coerced, mistreated, or unfairly took advantage of him.

3. *Brewer's Plea Was Fairly and Understandably Made*

In arguing that House failed to properly inform Brewer of the law, Brewer weaves in the third factor of manifest injustice—whether his plea was fairly and understandingly

18

made. He vaguely asserts that his plea was not so because he did not understand self-defense law.

Brewer is correct, of course, that any waiver of his rights and entry of a plea had to be done freely, knowingly, and voluntarily.

> "'The question of whether a plea is understandingly made must be weighed in light of certain constitutional and statutory requirements which attach to a defendant's plea. United States constitutional due process requirements relating to pleas of guilty or nolo contendere were imposed upon the States in *Boykin v. Alabama*, 395 U.S. 238, 242-44, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). To be constitutionally valid, guilty pleas and their resulting waiver of rights 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Edgar*, 281 Kan. at 36-37. [Citation omitted.]" *State v. Adams*, 311 Kan. 569, 575, 465 P.3d 176 (2020).

But the district court reviewed the plea hearing transcript and held that it showed that Brewer understood the consequences of his plea and freely, knowingly, and voluntarily waived his rights and entered the plea. The district court found that "[a]s the court inquired at the plea hearing, defendant knowingly and intelligently waived all of his defenses in order to secure a favorable plea agreement."

Our review of the plea transcript supports the district court's finding. At the plea hearing, Brewer told the court:

- He read and signed both the three-page written plea agreement and the five-page acknowledgment of rights and entry of plea form;
- House had explained to him the meaning, nature, and consequences of signing these documents;
- he understood what the documents said and what the documents meant;

19

- he did not have any questions;
- he was not under the influence of any substance or medication that would affect his cognitive ability; and
- he was satisfied with the services of his attorney.

And the district court credited House's testimony that he had explained the immunity discovery, the hearing, self-defense law, and that Brewer could raise self-defense at trial even absent immunity.

We find no error in the plea process, and Brewer has given us no persuasive reason to doubt the truth of his answers in that proceeding. And the judge who took Brewer's plea was the same judge who decided his motion to withdraw his plea, so he was in the best position to make that determination. The evidence supports the district court's findings that Brewer's plea was knowingly and intelligently entered. We find no manifest injustice permitting Brewer to withdraw his plea on this basis.

4.      *Brewer Fails to Show Actual Innocence*

Lastly, we briefly address Brewer's claim that he is actually innocent. It is proper for a court to consider other factors besides the three in *Edgar* in deciding a motion to withdraw a plea. See *State v. Aguilar*, 290 Kan. 506, 512-13, 231 P.3d 563 (2010). And a colorable claim of innocence may be another factor a court can consider when determining whether manifest injustice permits the withdrawal of a plea. See *Garcia*, 295 Kan. at 63 (judge may consider whether defendant is claiming innocence to show good cause as for motion to withdraw plea before sentencing). Here, the question is more complex, as Brewer raises this claim neither in a K.S.A. 60-1507 motion, nor in a pre-sentencing motion to withdraw a plea. And as the State contends, Brewer fails to show us a case in a similar procedural posture which has considered a claim of actual innocence. See, e.g., *Woods v. State*, 52 Kan. App. 2d 958, 379 P.3d 1134 (2016) (defendant who

20

had lost motion to withdraw his voluntary and intelligent plea of guilty and motion under K.S.A. 60-1507 for ineffective assistance of counsel could not collaterally attack his plea on grounds of actual innocence).

Brewer raised his claim of actual innocence in his proposed findings of fact and conclusions of law in support of his motion to withdraw his plea. He now argues that a claim of actual innocence can be based on factual or legal innocence, that immunity based on self-defense would make him legally innocent of aggravated battery, and that the evidence from the evidentiary hearing, the videos showing the altercation, and other evidence of record proves he acted in self-defense and was thus immune.

But the district court did not make any findings on this issue or address Brewer's claim of actual innocence, and Brewer never called this omission to the district court's attention. "[L]itigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal." *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016). Accordingly, Brewer has not preserved any argument about the district court's findings, or lack thereof, on this issue. See *State v. Jones*, 306 Kan. 948, 959, 398 P.3d 856 (2017).

We would have benefitted from the district court's findings on this issue. For example, does the same rule apply to Brewer in our review of his motion to withdraw his plea as applies to a defendant's attempt to make a colorable showing of actual innocence to bypass the bar for an untimely K.S.A. 60-1507 motion? See, e.g., *Beauclair v. State*, No. 123,671, 2022 WL 17546264 (Kan. App. 2022) (unpublished opinion) (examining K.S.A. 60-1507 motion). Does federal law apply here—that to establish the requisite probability that one was actually innocent, the petitioner must support the allegations with new, reliable evidence that was not presented at trial and must show that it was "more likely than not that no reasonable juror would have convicted him in the light of

21

the new evidence"? *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995); *Blacklock v. Schnurr*, No. 23-3253-JWL, 2024 WL 359330, at *5-6 (D. Kan. 2024) (unpublished opinion). And if so, does that actual innocence standard extend to affirmative defenses such as Brewer's theory of self-defense on which he asserted immunity? See *Pacheco v. Habti*, 62 F.4th 1233, 1243 n.8 (10th Cir. 2023) ("the circuits appear to agree that when an affirmative defense negates all guilt, it can support a claim of actual innocence," listing cases), *cert. denied* 143 S. Ct. 2672 (2023). And lastly, did Brewer present new, reliable evidence that would have showed no reasonable juror would have convicted him? We are a court of review, not a fact-finding court, and cannot resolve this issue in the first instance. Brewer has not properly preserved his claim of actual innocence for appeal.

Our review of the record shows nothing "'obviously unfair'" or "'shocking to the conscience'" about Brewer's plea. See *White*, 308 Kan. at 496. Finding no abuse of discretion in the district court's denial of Brewer's postsentence motion to withdraw his plea, we affirm.

Affirmed.

22